IN THE UNITED STATES COURT OF FEDERAL CLAIMS

ALPINE PCS, INC.,              :
                              :
v.                            :      16-1 C Judge Lettow
                              :
THE UNITED STATES            :      JUNE 20, 2016

### PLAINTIFF'S RESPONSE TO MOTION TO DISMISS

The Government asserts in its motion to dismiss that this Court lacks subject matter jurisdiction insofar as the entirety of this action is barred by operation of the six-year statute of limitations governing actions filed under the Tucker Act. At issue is the date on which the right to bring this claim accrued. On the Government's theory of the case, the statute of limitations began to run no later than 2008, thus making the December 31, 2015 filing, untimely as a matter of law. The plaintiff contends that the right to bring the action accrued no earlier than January 2010, and arguably not until June 3, 2013, when the District Court for the District of Columbia ruled that the choice of forum clause in the contract between the parties did not confer jurisdiction to hear an administrative appeal on the District Court, and that this action is therefore timely. The plaintiff contends that, as, pleaded, its breach of contract and takings claims are timely filed, and that there are facts sufficient before the Court to deny the motion to dismiss.

I.      **Legal Standard**

The factual allegations of the complaint are to be regarded as true and must be "construed in a light most favorable to the plaintiff." *Cedars-Sinai Medical Ctr. v. Watkins*, 11 F.3d 1573, 1583 (Fed. Cir.1993). This factual deference does not, however, apply, to the legal conclusions asserted in the

1

complaint. *Westland Water Dist. v. United States*, 109 Fed. Cl. 117, 190 (2013). At a minimum, there are disputed issues of material fact that require discovery and more robust pleading in order for this Court to evaluate the government's claim that the action is untimely as a matter of law.

## II.   The Factual Allegations in the Complaint

### A.   The Contracts Between Alpine PCS and the FCC

In May, 1996, Alpine PCS, Inc., hereinafter "Alpine," won the bid for two wireless spectrum licenses in the San Luis Obispo and Santa Barbara, California regions. Cpl. Para. 4. Payment for these licenses was governed by a written contract on an installment basis, with the FCC assuming the role of a secured creditor. Id., Paras. 5, 6. The notes were secured by collateral of Alpine's PCS licenses.  Id,, Para. 7. In the event Alpine defaulted on either of the notes, the FCC could, but was not required to, cancel the licenses and to seek accelerated payment on the notes. Id., Paras. 12, 13. "Default," the contract specified, meant failure to pay the amounts owing and due under the note. Id., Para. 11. In reliance on this contract, Alpine invested some $90 million of its own capital in the construction of networks to operate in the licensed areas. Id., Para. 14. These contracts were apparently never modified by the parties.

After formation of the Alpine contracts, other licensees who won similar bids for licenses, engaged in various legal stratagem to reduce their debt to the FCC. Id., Para. 15-17. Alpine did not do so, and for a five-year period, timely met its contractual obligations to the FCC. Id., Para. 20.

In 1998, the FCC adopted new regulations requiring the agency to "automatically cancel" a license if the licensee missed two consecutive quarterly payments. The FCC did so without seeking to modify its contracts with Alpine. Id., Para. 21.

### B.   Alpine Seeks To Exercise Its Contractual Right To Restructure Its Debt

Incident to the disruption in the financial markets caused by the 9/11 terror attacks, Alpine alerted the FCC it would have difficulty making timely payments on its notes. Id., Paras. 22 and 23. An FCC representative informed Alpine at or about this time that if it submitted appropriate restructuring and waiver requests, the parties would be able to continue to operate under the terms of the note and that Alpine would continue to enjoy the use of the licenses it won during the bid. Id., Para. 24. Alpine relied on this representation, Id., Paras. 25 and 26, submitting a restructuring request in July 2002, Id., Paras. 28 and 29, and a waiver of installment payment request under extent FCC rules. Id., Para. 30. Both the restructuring request and the waiver request were submitted prior to any default on payments. Id., Para. 31. The FCC promptly acknowledged receipt of both requests on or about August 30, 2002. Id., Para. 32.

Shortly after providing Alpine with notice of receipt of the restructuring and waiver requests, the FCC acknowledged to Alpine that it had mistakenly listed

the Alpine licenses as having reverted to the FCC. Id., Para 33. The parties

communicated in efforts to arrive at structuring terms until mid-2003, when the

FCC ceased communicating. Id., Para. 36.

For the first time, in January 2004, the FCC notified Alpine that it

considered Alpine in default on the notes. Id., Para 37. This finding was

apparently based on application of the revised FCC 1998 regulation, and not on

the contract it entered into with Alpine.

Even so, the FCC returned to Alpine its restructuring request "without

acting" on it on or about January 30, 2004. Id., Para. 39.  Three years later, on

January 29, 2007, the FCC's Wireless Telecommunications Bureau issued a

denial of the restructuring request. Alpine immediately filed an administrative

appeal of that decision. Id., Para. 40. Alpine sought a stay of any enforcement

action by way of a Chapter 11 bankruptcy petition, but relief was denied, resulting

in a new auction of the licenses previously held by Alpine. Id., Para. 42. The FCC

auctioned the licenses off for a total of $5,548,000 in 2008, before the

administrative appeal of the FCC appeal process had run its course. Id., Para.

42.

On January 5, 2010, the FCC issued a final denial of Alpine's restructuring

and waiver requests. Id., Para. 43.

Under the note entered into between Alpine and the FCC a default occurs when a maker has not made a payment, and has not submitted "a request, in writing for a grace period or extension of payments, if any such grace period or extension of payments is provided for in the then-applicable orders and regulations of the Commission."  In the alternative, a default occurs when a maker has submitted a request for a grace period and has not made payments after "denial of such a request for a grace period or extension." Id., Para. 44.

### III. The Contract Between the FCC and Alpine Gave Alpine Until The FCC Acted on Alpine's Request a Restructure Request Under The "Then-Applicable Orders and Regulations of the Commission"

The Government's motion to dismiss proceeds in a vacuum, asserting that the six-year statute of limitations accrued no later than January 29, 2007, when the FCC informed Alpine that it was rejecting Alpine's restructuring request. Government's Memorandum at p.4.  By ignoring the terms of the contract it entered with Alpine, the Government seeks to avoid the inescapable fact that Alpine's right to administrative review tolled the statute of limitations by agreement of the FCC. The contract between the parties permits the FCC to find a licensee in default if the licensee has failed to make payments after the "expiration of the grant of such a grace period or extension or upon denial of such a request for a grace period or extension" as provided for under "then-applicable orders and regulations of the Commission." Id., Para. 44.

For purposes of deciding this motion, the plaintiff contends this Court must construe the term "then-applicable orders and regulations of the Commission" to mean the orders and regulations in place at the time the contracts with Alpine were formed. Whether that reading can withstand a motion for summary judgment may well depend on the development of a factual record not yet before this Court. As pleaded, the plaintiff asserts he was given factual assurances that it could continue to enjoy the benefits of the licenses while its waiver requests were under consideration by the agency. Cpl., Para. 24.[1]

The Complaint reflects a troubling timeline: The FCC auctioned off the very licenses once held by Alpine while Alpine was actively litigating its claim for restructuring and waiver agreements with the FCC in proceedings arising under FCC rules and regulations.

Alpine was awarded licenses in 1996. For five years, Alpine made timely payments on the installment plans, notifying the FCC that it may need relief from the current installment plan. Alpine filed timely requests for both restructuring and waiver of payments under 31 C.F.R. Section 902.2 and 47 C.F.R. Section 1.2110. Id., Paras., 28 and 30. The FCC acknowledged receipt of both requests, and negotiations appear to have begun in earnest, despite the fact that the FCC

_____

[1] Indeed, should the case advance to discovery, it will become apparent that Alpine acted accordingly and continued to operate the two licenses. What's more, the FCC took no action to stop Alpine from using these licenses.

listed the licenses as reverted to the FCC in a public filing, an act an FCC agent claimed to have been the result of a "clerical error." Id., Paras. 34 and 35. The requests for restructuring and a waiver appear to have pended for more than four years despite a breakdown in communication initiated by the FCC. On January 29, 2007, a bureau of the FCC notified Alpine that its requests for relief were denied; within months the licenses were re-auctioned, despite the fact that Alpine had filed a timely appeal under FCC rules and regulations. Id., Paras. 40 and 42.[2]

The FCC issued a final denial of the restructuring requests on January 5, 2010. Id., Para. 43.

Put directly, the FCC re-auctioned licenses Alpine sought to retain while the agency was considering whether to grant Alpine's request for restructuring the waiver. The FCC did so without explanation, and in the context of regulatory proceedings that had been interminably delayed by the FCC's dilatory consideration of the requests for reconsideration and waiver. In reliance on the terms of its contracts, Alpine sought relief from the decision of the 2007 Telecommunications Bureau decision by relying on the "then-applicable … regulations" of the FCC to take an administrative appeal.

Alpine was not a stranger to the FCC during these proceedings. It had a contractual relationship with the FCC. Under the terms of that contract, Alpine had a right not to be considered in default until such time as Alpine had

---

[2] Once again, should the case proceed to discovery, it will become apparent that the FCC requested that Alpine update their financials in mid 2007. The FCC confirmed receipt of the financials in December 2007.

exhausted its rights under FCC rules and regulations. The FCC's motives for engaging in what amounted to a game of regulatory stall and delay are open to question, and, should this litigation advance, will be a subject of discovery.

### IV.    The Prior Litigation Of The Administrative Appeal

In reliance on the contracts between Alpine and the FCC, Alpine sought review of the full FCC denial of its waiver requests in the District Court for the District of Columbia.  Alpine asserted that under the terms of the choice of forum clause of the contracts, disputes were required to be filed in the District Court. In defense of that action, the FCC took a position at variance with the contract, arguing, for the first time, despite the agreement it entered into, the District Court did not have jurisdiction over the claim as administrative appeals were required to be filed in the United States Court of Appeals for the District of Columbia pursuant to the express terms of 47 U.S.C. Section 402(b)(5). The District Court agreed with the FCC, and Alpine took an appeal, raising claims that the choice of forum clause in the contracts amounted to a waiver of sovereign immunity, thus rendering the District Court an appropriate forum, and that the District Court owed deference to the FCC's judgment, as expressed in the contracts with Alpine, of where jurisdiction lay to resolve claims involving the FCC.

The Circuit Court rejected both arguments in a summary order. *Alpine PCS, Inc. v. FCC*, 563 Fed. Appx. 788 (2014). The Circuit Court noted in a footnote that Alpine did not challenge on appeal the District Court decision declining to transfer the action to Court of Federal Claims, noting that, for claims arising under Section 402(b), *Rochester v. Bond*, 603 F.2d 927 (1979) governs

choice of forum. *Alpine,* at 563 at 790, fn. 1. *Rochester* held that the Circuit

Court, and not either the District Court or the Court of Claims, had exclusive

jurisdiction over 402 administrative appeals. *Rochester* at 934. In an earlier

appeal, the Circuit Court ruled that claims about whether Alpine's debt

restructuring request suspended the automatic suspension rule were not properly

before the Court as they were raised only in Alpine's reply brief, and not in its

main brief. *Alpine PCS, Inc. v. FCC (In re Alpine PCS, Inc.),* 404 Fed. Appx. 504

(2010).

The instant claims of breach of contract and a quasi-regulatory taking are

raised for the first time here. They are ripe for review, could not have been raised

previously, and are not time-barred. Alpine is not seeking here to revise an

administrative appeal; its contention is simple – the FCC engaged in bad faith

conduct amounting to a breach of its contract and a regulatory taking of Alpine's

property. Alpine seeks just compensation in the form of money damages.

    **IV.  Even Without Reliance On A Theory Of Equitable Estoppel,
The Contracts Between The FCC And Alpine Created A
Justified Expectation On Alpine's Behalf That It Was Entitled
To Seek Full Agency Review Of The Telecommunication's
Bureau Decision Before Turning To The Courts For Relief**

Alpine understands and accepts the well-settled rules involving

construction of claims of waiver of sovereign immunity. "To bring a claim against

the United States, a plaintiff must identify an unequivocal waiver of sovereign

immunity in statutory text." *FAA v. Cooper*, 132 S.Ct. 1441, 1448, 182 L.Ed. 2d

49 (2012). Courts are required to read language purporting to effect a waiver of

sovereign immunity narrowly and construe any ambiguities in the statutory

language in favor of preserving immunity." *Alpine*, 563 Fed. Appx. 789.  Similarly, the plaintiff is mindful of the Supreme Court's recent decision barring consideration of equitable estoppel to extend a statute of limitations period. *John R. Sand & Gravel Co. v. United States*, 522 U.S. 130, 133 (2008). However, this case is altogether distinguishable from S*and.*

Four factors weigh heavily in Alpine's favor.

First, the FCC entered into contracts with Alpine committing the agency to rely upon "then existing rules and regulations" governing, among other things default and waiver requests. The agency later changed the rules to require automatic default without reference to waiver. On the record before the Court, nothing was done to provide Alpine with notice of this change in regulatory regime; nothing in the record suggests that the language referring to "then-existing rules and regulations" referred to potential changes to the FCC rules and regulations after the contract was signed. Alpine filed timely waiver requests before it was found to be in default. The FCC's inconsistent application of regulatory regime resulted in a playing field on which Alpine could not intelligently or consistently exercise its rights. The result was a forfeiture of valuable licenses, and the loss of tens of millions of dollars of investment capital.

Second, the FCC induced reliance by Alpine on the efficacy of its waiver requests by assuring Alpine that it could continue to do business as usual pending a decision on the waivers.

Third, the lengthy delay between submission of Alpine's waivers to the FCC in 2002 and denial by the FCC'S Telecommunications Bureau in 2007

added four-plus years to the time beyond which the FCC now asserts Alpine's action accrued having lulled Alpine into believing it was pursuing effective remedies.

Finally, the contract between the parties contained a choice of forum clause the FCC either knew, or should have known, was unenforceable, and would, if exercised by Alpine, result in further delay in bringing an action to the proper court. Whether this was the result of administrative incompetence or part of a deliberate strategy to lull Alpine and all other auction winners down a dark alley from which it could not emerge with its right to challenge FCC misconduct intact is, at this stage of the proceedings, an open question.

The totality of these circumstances would support a theory of equitable estoppel in a case in which equity applied. In the absence of equity, this Court can, and should, rule that the cause of action did not accrue, given the acts of the FCC, until final agency action in January 2010.

> **A.  Pursuant to The Constitution and Federal Statute, The Federal Court of Claims Jurisdiction Over Takings Claims Arising Under The Fifth Amendment To The United States Constitution Is Unquestioned.**

There is no disputing that this Court has jurisdiction over a takings claim such as this, arising as it does under the Fifth Amendment to the United States Constitution, which, since 1791 has explicitly provided "nor shall private property be taken for public use, without just compensation."

Accordingly, and pursuant to the Tucker Act[3], 28 U.S.C. §1491, jurisdiction

_____

[3] In conferring jurisdiction over takings claims on the United States Federal Court of Claims, the Tucker Act does not create a substantive right that can be

over takings claims against the federal government which exceed $10,000 lies in

the U.S. Court of Federal Claims located in Washington, D.C. The Tucker Act

has been interpreted as a waiver of sovereign immunity conferring jurisdiction

over claims that either (1) arise from an express or implied contract with the

United States; (2) seek a refund of a prior payment made to the government; or

(3) are based on federal constitutional, statutory, or regulatory law.  *United States*

*v. Testan*, 424 U.S. 392, 400, 96 S.Ct. 948, 47 L. Ed.2d 114 (1976) *reh'g denied*,

446 U.S. 992, 100 S.Ct. 2979, 64 L.Ed.2d 849 (1980).  It is a matter of well-

settled law, then, that "[i]f there is a taking, the claim is founded upon the

Constitution" and jurisdiction to hear and determine that claim lies with the Court

of Federal Claims.  *United States v. Causby*, 328 U.S. 256, 267, 66 S.Ct. 1062,

90 L.Ed.2d 1206 (1946).

> 1. **The Facts As Pleaded And Supplemented By The Related Decisions Establish A Regulatory Taking, Demonstrate Arguable Bad Faith On The FCC's Part, And Reveal A Takings Claim That Did Not And Could Not Accrue Until The Gradual Process Set Into Motion By The Government Defendant Effected A Permanent Taking.**
>
> > a. **Alpine Has A Clearly Established Constitutional Property Interest In Its License That Is Subject To A Takings Claim Under The Fifth Amendment To The United States Constitution.**

Since at least the time of *NextWave*[4], the Constitutional magnitude of the

property interest in the auctioned wireless license at issue here has been

established, if not definitively mapped.  Similarly, *NextWave* also established that

_____

enforced against the United States for money damages.  *United States v. Mitchell*, 445 U.S. 535, 538, 100 S.Ct. 1349, 63 L.Ed.2d 607 (1980).

[4] *FCC v. NextWave Pers.Communications Inc.,* 537 U.S. 293 (2003).

administrative policy preference cannot be a valid basis for denying a property holder their rights as provided by law[5]. Here, the FCC's administrative policy preference and regulatory interpretation directly conflicts with 47 U.S.C. 309(j).

Given the contours of Alpine's property rights in its spectrum license, the regulatory taking of the Alpine license is subject to the standard takings analysis as set forth in *Pennsylvania Coal Co. v. Mahon*, 260 U.S. 393, 43 S.Ct. 158, 67 L.Ed.2d 322 (1922), and its progeny.  In *Mahon*, the Supreme Court recognized that not every government action will appropriate, encroach upon or occupy property in the same way as a physical taking, and yet might still affect and limit the use of property to such an extent that a taking occurs nonetheless.  Id. at 415.  Such a taking is known as a regulatory taking, as distinct from a physical taking.

     **b.**  **Given That There Is No Bright-Line Test To Determine A Regulatory Taking, And The Court Must Engage In A Three-Part *Penn Central*[6] Analysis.**

Though no talismanic or bright-line test has been developed to determine when a particular government action has gone so far as to effect a regulatory

---

[5] In *NextWave*, the FCC took the position that it had revoked spectrum licenses according to valid regulatory reasons, but the Court found that such a rationale was merely an administrative policy preference for selling licenses on credit and then revoking and reselling them to take advantage of rising market prices rather than assert a security interest. Id at 304

[6] *Penn Central Transp. Co. v. New York City*, 438 U.S. 104, 124, 98 S.Ct. 2646, 57 L.Ed.2d 631 (1978) (wherein the Court first identified three factors to be considered in assessing whether a regulation's effect on property has triggered a taking.)

taking[7], certain nuances have solidified into general principles. For instance, it is generally accepted that a regulation that "denies all economically beneficial or productive use of [property]" requires just compensation under the takings clause. *Lucas v. South Carolina Coastal Council*, 505 U.S. 1003, 1015, 112 S.Ct. 2886, 120 L.Ed.2d 798 (1992).

However, where the regulatory limitation placed on property falls short of completely eliminating all economically beneficial use of it by the owner, the Court has stated that there is no "set formula" for determining when governmental regulation becomes a taking, and thus it must be determined on a case-by-case basis. *Goldblatt v. Town of Hempstead*, 369 U.S. 590, 594, 82 S.Ct. 987, 8 L.Ed.2d 130 (1962). To aid in this determination, the Court has identified an analysis, known as the *Penn Central* analysis, that revolves around three factors of "particular significance:" (1) economic impact of the regulation on the claimant; (2) extent of the regulatory interference with distinct investment-backed expectations; and (3) the character of the governmental action. *Connolly v. Pension Benefit Guaranty Corp.*, 475 U.S. 21, 224-225, 106 S.Ct. 1018, 89 L.Ed.2d 166 (1986). Furthermore, this inquiry must be informed by the purpose of the takings clause, which is to prevent the government from "forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole." *Armstrong v. United States*, 364 U.S. 40, 49, 80 S.Ct. 156, 4 L.Ed.2d 1554 (1960).

---

[7] *NextWave* offers guidance about the property rights inherent in the spectrum license, but did not decide whether the license cancellation or revocation established a regulatory taking.

### c.   A Proper Application Of The *Penn Central* Analysis Supports Alpine's Claim

Applying the prescribed *Penn Central* analysis to the present case leads inexorably to the conclusion that the FCC's continuing course of actions ultimately and permanently affected a taking of the Alpine license in January 2010.  First, with regard to the economic impact of the FCC regulations on Alpine, the impact can only be described as devastating: the revocation and re-auctioning of the Alpine license in tandem with the FCC's self-serving, policy-preference interpretation of its regulations and its disavowal of the choice of forum provision at the District Court robbed Alpine of its property entirely.

Similarly, the extent of the regulatory interference of the FCC with the distinct investment-backed expectations of Alpine was near absolute once it slammed the door to effective agency review shut in the January 2010 final decision.  Certainly, until that final betrayal by the Government, it was entirely reasonable for Alpine to expect that it would be allowed to pursue its legal remedies as set forth in the very contract by which it had gained the license, and its investors would reasonably expect them to do so. Alpine was provided assurances by the FCC that it could continue to do business so long as it pursued its waivers.

And, finally, the character of the gradual, back-and-forth process set into motion by the governmental action demonstrates bad faith. Alpine had every reason to believe that the FCC had not made a final decision; the government's misdirection ultimately effected a permanent deprivation in the nature of a "categorical taking" like that at issue in *Lucas*, supra, 505 U.S. 1003, at 1019.

Though awkward and faltering, the FCC nonetheless used its newly promulgated regulations to proceed by fits and starts and unilaterally revoke Alpine's licenses, then to re-auction them, and ultimately permanently deprive Alpine of the licenses by virtue of its January 2010 denial of Alpine's Petition for Reconsideration.

> **B. Due To The Timing Of The Defendant's Acts, The Claimant's Cause Of Action Could Not And Did Not Accrue In This Case Until The Gradual Process Set In Motion By The Government Defendant Stabilized Once The FCC Reached A Final Decision Regarding The Application Of The Regulations To The License**

Given the clear establishment of a regulatory taking by virtue of the FCC's actions, the only question left for this Court to determine is when the claimant's right of action in this matter accrued. "A claim against the United States first accrues when *all the events* have occurred which fix the alleged liability of the defendant." *Catawba Indian Tribe of South Carolina v. United States*, 982 F.2d 1564, 1570 (Fed.Cir. 1993) (Emphasis added; quoting *Corman, Limitations of Actions*, §6.1 (1991)). The "proper focus for statute of limitations purposes is *upon the time of the defendant's acts*, not upon the time at which the consequences of the acts became most painful." *Fallini v. United States*, 56 F.3d 1378, 1383 (Fed. Cir. 1995) (Emphasis added; internal quotations omitted).

This idea has been distilled into the term "stabilization", and the Federal Circuit has stated that "stabilization occurs when it becomes clear that the gradual process set into motion by the government has effected a permanent taking, not when the process has ceased or when the entire extent of the damage is determined…" but rather when "it is clear that the process has

resulted in a permanent taking and the extent of the taking is reasonably

foreseeable, the claim accrues and the statute of limitations begins to run."

*Boling v. United States*, 220 F.3d 1365, 1370-71 (Fed. Cir. 2000).  Necessarily,

stabilization, or the "point at which the taking becomes sufficiently certain to give

rise to a claim for compensation varies in each case."  *Cooper v. United States*,

827 F.2d 762, 764 (Fed. Cir. 1987).

> **1.    Based Upon The Clear Timeline Of The Defendant's Acts,  Only The January 5, 2010 Final Denial Of Alpine's Restructuring And Waiver Request Amounted To Stabilization Sufficient To Trigger Alpine's Takings Claim, Which Falls Squarely Within The Applicable Six-Year Statute Of  Limitations**

As noted by the Supreme Court in *Palazzolo v. Rhode Island*, 533 U.S.

606, 121 S.Ct. 2448, 150 L.Ed. 2d 592 (2001), with respect to a governmental

agency's exercise or application of its regulations, a takings claim challenging the

application of regulations is not ripe (and thus a claim does not accrue) until and

unless the agency charged with implementing the regulations has reached a final

decision regarding their application to the property at issue.  Id. at 607.  A final

decision by the responsible agency informs the constitutional determination

whether a regulation has deprived a claimant of all economically beneficial use of

the property under *Lucas,* supra, 505 U.S. at 1015, and also whether, pursuant to

*Penn Central*, 438 U.S. at 124, the reasonable investment-backed expectations

of the property owner have been defeated, resulting in a taking.  "[T]hese matters

cannot be resolved in definite terms until a court knows the extent of the

permitted [use]" of the property in question.  (Internal quotation omitted)

*Palazzolo*, supra, 533 U.S. at 618.

Thus, in Alpine's case, its cause of action could not and did not accrue until the gradual, back-and-forth process set in motion by the FCC stabilized when the FCC reached a final decision regarding the application of its regulations to the license in January 2010.  Until that time, the extent of the restriction on Alpine's license could not be known, given the various and conflicting representations made by the FCC to the plaintiff, and its changing policy position for regulatory action that fluctuated according to the rise and fall of the market for such licenses; a regulatory taking could not be established.  Moreover, until that point the demonstrated course of action by the FCC constituted mere policy preference, and not valid regulatory action.

### a.    A Long And Winding Road: Denial of the Waiver Request in January 2010

Pursuant to the terms of its license, as controlled by 47 U.S.C. 309 (j), Alpine informed the FCC following the 9/11 attacks that it would have difficulty making timely payments on its installment plan.  Invoking its policy preference at that time not to revoke under the regulations[8] (given that the market value of the license was at that time less than what Alpine had paid for it), the FCC directed Alpine to submit restructuring and waiver requests and assured Alpine that doing so would allow Alpine to continue to operate under the terms of its license and thus enjoy its full beneficial economic use.  In reliance upon this representation by the FCC, Alpine timely submitted its restructuring request in July 2002 and a waiver of installment payment request, prior to any default on payments.

---

[8] Per *NextWave*, 47 U.S.C. 309(j) does not require cancellation or revocation.  Id at 304.

Accordingly, the FCC acknowledged receipt of both requests on or about August 30, 2002.  Though the FCC later acknowledged having listed the Alpine license as having reverted to the FCC*, it admitted to having done so erroneously* and engaged in restructuring discussions with Alpine until mid-2003, when it unilaterally decided to cease communicating with Alpine.

   Then, in an apparent unlawful application of its policy preference (as opposed to a lawful regulatory action), the FCC in January 2004 notified Alpine that it now considered Alpine in default, despite no change in the terms of the license, thus setting in motion the gradual process that would ultimately mature into a permanent taking.  Inexplicably, the FCC then returned Alpine's restructuring request *"without acting" on it* on or about January 30, 2004.  Not until three years later on January 29, 2007 did the FCC's Wireless Telecommunications Bureau issue its denial of the restructuring request[9], which Alpine immediately appealed administratively, per its rights under the terms of the license.  This appeal was an invocation of Alpine's rights that was part and parcel of the beneficial economic use of its license.

   While the appeal was still pending, and without apparently correcting the clerical error that had listed the license as having reverted to the FCC, the FCC auctioned the Alpine licenses in 2008 before the administrative appeal of the FCC appeal process had even run its course.  However, and despite the re-auctioning of the licenses, it was not until January 5, 2010 that the FCC issued its

---

[9] Discovery will relay that throughout this period, the FCC continued to request update financial information from Alpine, and that Alpine provided such information.

final denial of Alpine's restructuring and waiver requests.  Thus, the

Government's contention that its January 29, 2007 rejection of Alpine's

restructuring request marks the accrual date of Alpine's takings claim is undercut

by its own actions.[10]

  If, per *Palazzolo,* a takings claim challenging the application of regulations

is not ripe (and thus a claim does not accrue) until and unless the agency

charged with implementing the regulations has reached a final decision regarding

their application to the property at issue; and if, per *Fallini,* the "proper focus for

statute of limitations purposes is *upon the time of the defendant's acts*", then the

FCC must live with the fact that through its representations it led Alpine to

reasonably believe that it had not reached a final decision and in fact did not

reach a final decision about how it would apply its regulations to Alpine until

January 5, 2010.  To conclude otherwise would be to elevate unlawful policy

preference to the status of valid regulatory action in clear contravention of

*NextWave*.

  In conclusion, and in light of the distinct contours of the property interest at

issue in the takings claim presented here, the FCC in this case should no more

be allowed to escape the terms of its contract with Alpine and unilaterally revoke

its license without providing Alpine just compensation here than it was allowed to

escape §525 of the Bankruptcy Code in *NextWave*[11] by attempting to proffer a

---

[10] Discovery will reveal that after January 29, 2007 the FCC requested updated Alpine financials.

[11] *NextWave*, which affirmed the Constitutional property status of the license at issue here and suggested that auctioned licenses should be treated no differently than any other property or asset that might fall under the aegis of bankruptcy law

plausible regulatory reason for license revocation that would have made §525 a nullity.  *FCC v. NextWave Pers.Communications Inc.,* 537 U.S. 293, 296 (2003). Analogous to the situation in *NextWave*, holding otherwise here would enable the agency to go on concocting additional reasons for revocation and re-auctioning *ad infinitum*, elevating as it would predatory administrative policy preferences to the level of valid regulation.  Plainly, such an outcome is both undesirable and unlawful.

### C.    *Sand* Ought Not to Control in this Case

In *Sand*, the Government did not seek to raise a statute of limitations defense as to all claims brought by the plaintiff, apparently conceding that certain claims were timely. After the Government won at trial, the plaintiff took an appeal. The Government did not raise the statute of limitations as a defense on appeal, effectively waiving the issue. The Appellate Court, responding to a brief by Amicus counsel, ruled that the statute of limitations was applicable in this case, and ruled in favor of the Government. The Supreme Court upheld the Appellate Court's decision, ruling that the equitable estoppel doctrine is generally inapplicable in a case arising under the *Tucker Act.* However, in *Sand*, the reported decision sheds no light on the conduct that led to the fatal delays in *Sand* – the instant case, by contrast, is steeped in allegations that the delay in bringing an action to this Court is the result of the FCC's agreement to a choice of forum clause it either knew, or should have known, was infirm and would result in delay. Notwithstanding the powerful policy arguments militating in favor of a

---

declined to further define the contours of the property interest in an auctioned telecommunications license.

strict construction of sovereign immunity waivers in cases of this sort, *Sand* did not reach the issues, or the sort of conduct, alleged in this case.

In the instant case, Alpine contends that the FCC's conduct giving rise to this litigation – its entering into a contract with a choice of forum clause it later sought to repudiate to the detriment of Alpine, together with its alteration of the default rules without renegotiating the contracts with Alpine, and the long delays in considering Alpine's waiver and restructuring requests are grounds sufficient to toll the statute altogether. Simply put, in *Sand*, no light was shed on the Government's pre-litigation conduct. In the instant case, the Government created the delay it now seeks to use against the plaintiff.

In the alternative, Alpine contends that the statute of limitations in the takings claim did not accrue until the District Court, in June 2013, ruled that the contract between FCC and Alpine directed Alpine to brings its claims against the FCC in the wrong Court.

## VI.     This Claim Was Not Ripe Until Alpine Had Availed Itself Of Potential Remedies Under the FCC Rules and Regulations

### A.     Prudential Exhaustion Ought To Apply

Alpine contends that given the unique facts of this case, the Court can, and should, exercise its discretion by ruling that the statute of limitations did not accrue until the full FCC ruled on Alpine's waiver requests in January 2010. Although the Tucker Act does not require exhaustion, the Supreme Court has recognized a theory of prudential exhaustion that may be applicable. *McCarthy v. Madigan*, 503 U.S. 140, 144 (1992), cited in, *White & Case v. United States*, 67 Fed. C. 164, 169-70 (2005). In this case, the underlying issues and the lengthy

22

delay between the initial application for the waivers in 2003 and the decisions by the FCC, in 2007 and 2010, suggest that prudential exhaustion should be applied.

The plaintiff does not contend that there is a statutory exhaustion requirement requiring a party to bring get a final agency decision before turning to the federal courts for relief. See, 47 U.S.C. Section 405. However, Alpine contends that this Court has discretion to require prudential exhaustion, and asks that the Court do so. Simply put, the full scope of the FCC's review was not perfected as to the takings claim until the final decision of the agency was rendered in 2010, and the full record is necessary for adequate review.

Alpine concedes the difficulty of this argument. Decisions from this Court have previously held that a permissive form of exhaustion does not toll the statute of limitations. *Kirby v. United States*, 201 Ct. Cl. 527, 1973 WL 21341, *2 (1973); *Allen v. United States*, 46 Fed. Cl. 677, 681 (2000). However, the case of *Wilson v. MVM, Inc.*, 475 F.3d 166 (3rd Cir. 2007) suggests that prudential exhaustion may offer relief from a statute of limitations in some circumstance, in that case a showing of futility by clear and convincing evidence. *Id.,* 175-76.

Prudential exhaustion is required where the "twin purposes of protecting administrative agency authority and promoting judicial efficiency" are served. *White & Case*, 67 Fed. C. 169-170, *citing*, *McCarthy*, 503 U.S. at 145. In this case, the plaintiff filed an appeal to the full FCC after initial denial of its waiver requests. Among the claims it made to the full FCC was whether the agency had violated the contract it entered into with Alpine by the manner in which it denied

the waivers -- Alpine raised in its appeal to the full FCC whether the agency had breached its agreement with Alpine, an issue not raised in the Telecommunications Bureau. [12]

Alpine's licenses had been administratively forfeited before the FCC's final decision in 2010, had the full FCC ruled in Alpine's favor, the result would have been regulatory chaos – the FCC had already auctioned the licenses previously held by Alpine and award them to third parties. If the agency tried to take the licenses back from the new licensees, the new licensees would have been aggrieved, and could have claimed to have suffered a taking of their property. If the FCC granted the waiver requests, but refused to reallocate the licenses as a remedy, then Alpine's recourse would have been be for liquidated damages, and agency authority to award those are questionable. Judicial economy would clearly be served by requiring prudential exhaustion is a case of this sort.

### VII. Arguably, The Statute of Limitations As To The Taking Claim Did Not Begin To Run Until The District Court Refused To Honor The Terms Of The Contract The Parties Entered Into Regarding Choice Of Forum

The course of dealing between the FCC and Alpine was, to say the least, complicated and characterized by mixed signals generated in large measure by the FCC's often contradictory communications.  Alpine relied upon a written contract with the agency, on the verbal communications of agency representatives, on regulatory forbearance, and on the continued use and enjoyment of the licenses in question long after the period the agency now claims

---

[12] The plaintiff concedes that these issues are not before the Court by way of pleadings at this stage of the litigation.

the licenses were forfeited by default.  It cannot fairly be said of the complaint flied by Alpine that it either fails to state a claim, an assertion that the FCC has not claimed, or that the claim Alpine has asserted was brought in an untimely manner.

Alpine contends that as to the contract and takings claims, the statute of limitations began to run in 2013, when a District Court judge ruled that the contract the FCC entered into with Alpine did not permit Alpine to seek review of agency decisions in the forum required by the contract.  As a result of that ruling, Alpine lost the right to seek review of the administrative ruling costing it its licenses.

Alpine urges this Court to permit this action to advance to the discovery stage so that it can assemble a more complete record about the course of dealings between the FCC and Alpine. It is Alpine's contention that the FCC acted in bad faith in its handling of the Alpine licenses, and that this bad faith, will, as a matter of law, be found sufficient to support a judgment that the agency's conduct amounted to both a breach of the contract and a regulatory taking.

### VIII.    Conclusion

The legal and factual issues present in this case warrant further development by way of discovery. In the alternative, the plaintiff requests permission to amend his complaint to better frame with additional facts some of the issues raised in the instant brief.

The plaintiff requests that the Government's motion to dismiss be denied. There are significant issues of law and fact warranting further litigation as to the contract claims and the takings claim. The Government may not like the universe its contracts helped to create in this case. Alpine certainly does not. After being induced to sit patiently as it sought review first in the FCC, then in the very court the FCC contracts required it to turn to, Alpine is stunned by the FCC's cynical effort to disavow its contract, and claim, in effect, you trusted us for too long to now timely seek justice.

**THE PLAINTIFF**

By_____/s/_____
ROSS M. BABBIT by Norman A. Pattis
1382 W. 9th Street, Suite 220
Cleveland, Ohio 44113
216-623-6346
NORMAN A. PATTIS
Pattis and Smith, LLC
383 Orange St., First Floor
New Haven, CT 06511
203.393.3017
203.393.9745